## UNITED STATES v. SMITH.

### (District Court, M. D. Pennsylvania. April 19, 1902.)

### No. 1.

1. INTERSTATE COMMERCE—ACT REGULATING SHIPMENT OF GAME—INDICTMENT FOR VIOLATION.

Act May 25, 1900 (31 Stat. 187, c. 553), which (section 3) makes it unlawful for any person to deliver to any common carrier, or for such carrier to transport from one state or territory to another, "the dead bodies or parts thereof of any wild animals or birds, where such animals or birds have been killed in violation of the laws of the state, territory or district in which the same were killed," and which (section 4) requires all packages containing such dead animals, birds, or parts thereof, when shipped by interstate commerce, "as provided in section 1 [3?] of this act," to be plainly and clearly marked on the outside to show the name of the shipper and the nature of the contents, and prescribes a fine for each violation or evasion of the act, relates solely to game which has been killed in violation of the local law; and in a prosecution thereunder, whether for a violation of the act by shipment of game or for an evasion by a failure to mark the packages containing the same, the fact that it was so killed must be averred in the indictment and proved.

2. SAME.

It is essential, to constitute an offense under either of said provisions, that the prohibited game should either have been shipped or delivered to a carrier for shipment, and an indictment which charges the defendant with having prepared certain described game with intent to ship it by interstate commerce, or having concealed the same in unmarked packages for the purpose of such shipment, in evasion or violation of the act, without alleging delivery to a carrier, is insufficient.

3. SAME.

It may be difficult to define just what in every instance will amount to an evasion of the act; but it must at least be something contrived or done in connection with a shipment actually entered upon, and not one that is in mere contemplation.

Criminal Prosecution. On demurrer to indictment.

The following is a copy of the indictment:

United States of America, Middle District of Pennsylvania—ss.

In the District Court of the United States, in and for the Middle District Aforesaid, at the November Term Thereof, A. D. 1901.

The grand jurors of the United States, impaneled, sworn, and charged at the term aforesaid of the court aforesaid, on their oath present that N. S. Smith, on the 21st day of October, in the year 1901, in the said division of said district, and within the jurisdiction of said court, N. S. Smith, yeoman, did knowingly, willfully, and unlawfully prepare for transportation by interstate commerce, with intent to ship the same out of the state of Pennsylvania, certain packages containing the bodies of dead animals, birds, or parts thereof, to wit, a certain package containing the body of one deer, certain other packages containing the bodies of fifty English pheasants, and certain other packages containing the bodies of fifty native pheasants (all of which said animals had been taken and killed in the state of Pennsylvania), which said packages so prepared for shipment, and with intent to ship by interstate commerce from the state of Pennsylvania to the state of New York, were not plainly and clearly marked, so that the name and address of the shipper and the nature of the contents of the said packages could be readily ascertained on inspection of the outside of said packages, contrary to the provisions of section 4 of chapter 553 of a certain act of con-

gress approved May 25, 1900, entitled "An act to enlarge the powers of the department of agriculture, prohibit the transportation by interstate commerce of game killed in violation of local laws and for other purposes"; contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the United States. And the grand jurors aforesaid, on their oath aforesaid, do further present that the said N. S. Smith, yeoman, on the 20th day of October, in the year 1901, in the said division of said district, and within the jurisdiction of said court, did knowingly, willfully, and unlawfully, for the purpose of evading the act of congress in the foregoing first count particularly mentioned and described, place and conceal certain dead animals, birds, or parts thereof, in trunks, boxes, dressing cases, satchels, and packages then and their in his possession at Glen Eyre station on the Erie Railroad, in Pike county, Pa., with the intent thus to carry over said railroad by interstate commerce from the state of Pennsylvania into other states, in violation of the provisions of section 6 of an act of the general assembly of Pennsylvania approved June 4, 1897, entitled "An act for the better protection of game and game mammals, game birds, song and insectiverous birds, limiting the number of game birds and game mammals to be killed by any one person in one day or in one season, prohibiting the sale of the game and the shipment thereof out of the state, and providing penalties for the violation thereof" (Laws 1897, p. 123), the said dead animals, birds, or parts thereof, so placed and concealed as aforesaid; the said trunks, boxes, dressing cases, satchels, and packages containing the said dead animals, birds, or parts thereof, to wit, one deer, fifty English pheasants, and fifty native pheasants (all of which said animals had been taken and killed in the state of Pennsylvania), not being clearly marked, so that the nature of the contents could be readily ascertained on inspection of the outside of said trunks, dressing cases, boxes, satchels, and packages, and the said dead animals, birds, or parts thereof, being so placed in the various receptacles aforesaid for the purpose of enabling the defendant above named secretly to carry the same by interstate commerce over the said railroad beyond the limits of the state of Pennsylvania, in violation of the aforesaid act of the general assembly of Pennsylvania, and in evasion and violation of the act of congress in the foregoing first count particularly mentioned and described; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States. And the grand jurors aforesaid, on their oath aforesaid, do further present that the said N. S. Smith, yeoman, on the 20th day of October, in the year 1901, in the said division of said district, and within the jurisdiction of said court, did knowingly, willfully, and unlawfully prepare for shipment by interstate commerce, and did have in his possession with intent to ship by interstate commerce, certain packages containing dead animals or birds, to wit, a certain package containing the body of one deer, a certain package containing the bodies of fifty English pheasants, which had been killed in violation of the game laws of the state of Pennsylvania, and a certain package containing fifty native pheasants (all of which said animals had been taken and killed in the state of Pennsylvania), which said packages so prepared for shipment and intended to be shipped by interstate commerce from the state of Pennsylvania to the state of New York were not then and there plainly and clearly marked, so that the name and address of the shipper and the nature of the contents thereof could be readily ascertained on inspection of the outside of the said package, contrary to the provisions of the act of congress in the foregoing first count particularly mentioned and described, etc., contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.

W. S. Kirkpatrick and C. S. Bull, for demurrer.

S. T. M. McCarrell, U. S. Atty., John S. Wise, and Robt. Snodgrass, contra.

ARCHBALD, District Judge. This indictment is framed under the third and fourth sections of the act of May 25, 1900 (31 Stat. 187,

c. 553), commonly known as the "Lacey Law." Aside from the question of the validity of that statute or the exact purpose to be attained by it, it is to be observed, as a matter which lies on the surface, that the game that is there prohibited from being shipped from one state or territory to another is that, and only that, which has been killed in violation of the local law. Omitting matters of verbiage, the act in substance declares that it shall be unlawful for any one to deliver to any common carrier, or for any common carrier to transport from one state or territory to another, "the dead bodies or parts thereof of any wild animals or birds where such animals or birds have been killed in violation of the laws of the state, territory or district in which the same were killed." As a necessary consequence of this, there is no violation of the act unless the game shipped or sought to be shipped has been so killed, and the fact that it was is of the essence of the offense, and must be averred and proved. While the federal courts will no doubt take notice of the statute laws of the different states with respect to the killing of game within their respective borders, this does not do away with the necessity for declaring, as well as showing, that they have in fact been violated. If this be so, the first and second counts of the indictment are fatally defective. There is no averment whatever as to where the game there spoken of was killed,—whether in Pennsylvania or elsewhere; or that when and where killed it was killed in violation of the local law. All that we have is the bald statement in the one count that the defendant had prepared for shipment by interstate commerce out of the state, certain packages of dead game, without having them clearly marked with the name and address of the shipper and the nature of the contents, as required by the act: and in the other that he had concealed the game spoken of in trunks, satchels, etc., without having them so marked, with the intent to carry them out of the state into other states, in violation of the act of the general assembly of Pennsylvania approved June 4, 1897, and in evasion and violation of the act of congress in question. But there was no necessary vice in any of these acts by themselves. The game may have been innocently killed, and we must presume that it was until it appears otherwise. For all that we know, it may have been killed in Canada, or some other equally irrelevant place, with which the facts charged are just as consistent as they are with anything which is prohibited. It is true that these counts deal with alleged evasions of the law, which, by the terms of the statute, are punishable equally with direct violations of it. But that does not affect the question. Whether it be an evasion or a violation that is charged, neither can exist, except the game which is the subject of it was killed in disregard of the local law, the prohibition of the statute being predicated wholly upon that circumstance.

Nor is the second count helped out in this regard by the reference there found to the act of the general assembly of Pennsylvania entitled "An act for the better protection of game," etc. (P. L. 1897, p. 123). All the use made of this reference is to declare that the acts of the defendant complained of were done with the intent to carry the game out of the state, contrary to the provisions of that statute. But with this by itself the act of congress has no concern. It does not make it.

unlawful to ship out of a state dead game which the laws of that state prohibit from being taken beyond its limits, but only such game as has been killed in violation of those laws. The distinction is important and material, and must be observed. Nor have I failed to note in this connection the last clause of the third section of the act, which provides that nothing therein shall prevent the transportation of any dead birds or animals killed in season, "the export of which is not prohibited by law in the state, territory or district in which the same are killed." This, it is to be noted, is not prohibitive, but permissive. It is a proviso introduced out of extra caution to limit and explain the extent to which the preceding clause is to go, and cannot, therefore, be held to enlarge it. Or, in other words, we cannot reach out by virtue of it, and say that, because the export of game which is not prohibited by the state law is thereby allowed, that which is prohibited is not; on the contrary, we must strictly adhere to what the statute in express terms forbids and punishes, and that, as we have seen, relates solely to game which has been unlawfully killed. This disposes of the first two counts, and we need concern ourselves no further with them.

The third count, however, remains. That charges the defendant, in substance, with having prepared for shipment by interstate commerce, and having in his possession with intent to so ship, certain packages, one containing the body of a deer, and the other the bodies of 50 English pheasants, which had been killed in violation of the game laws of the state of Pennsylvania. It also speaks of a third package of 50 native pheasants, but, as it does not state where or how they were killed, under the views already expressed no charge can be predicated upon them. But the count goes on to declare that the packages referred to were prepared for shipment, and were intended to be shipped, by interstate commerce from Pennsylvania to New York, without having been plainly and clearly marked with the name and address of the shipper and the nature of the contents, so that the same could be readily ascertained by inspection of the outside, as required by the act of congress under discussion. Does this charge an indictable offense within the meaning of that law? Passing by the question whether it is a sufficient description of the offense supposed to be charged to aver that the game spoken of was killed in violation of the state law, without specifying just what were the provisions of that law, or in what respect it was violated, the important thing to observe is that all that is, in any event, charged is that the defendant prepared the packages described for shipment, or with intent to ship, by interstate commerce from Pennsylvania, where the game was killed, to New York, its intended destination, without having them marked as required by the statute. It is very clear that this does not bring the case within the law. It is the shipment or delivery for shipment which the act forbids and punishes; not the intent to do so, nor the preparation for it. Or, in other words, it is the complete, and not the inchoate, act which it undertakes to control; and we have no right to carry it a single step further. I do not mean that the game or packages must have been actually put into the vehicles by which the shipment is to be accomplished. A delivery to a common carrier for that purpose is made

unlawful, as well as the actual transportation of it. And interstate commerce has clearly begun, so as to bring the case within the power of congress to regulate, when there has been such a delivery. But anything which stops short of this not only would seem to be beyond the authority of congress to direct, but, what is more to our present purpose, does not fall within the terms of the act by which that body has spoken, which does not assume to punish the intent or the preparation, or in fact anything else than an actual delivery to the common carrier for intended interstate transportation.

It is contended, however, that evasions of the act are made punishable equally with direct violations of it, and that is undoubtedly the case. "For each evasion or violation of this act" it declares (section 4) "the shipper shall upon conviction pay a fine," etc. It may be difficult, and it is not necessary, to define just what, in every instance, will amount to an evasion; but of this much we can be sure, and that is that it must be something contrived or done in connection with a shipment actually entered upon, and not one which is in mere contemplation. The statute itself suggests and seeks to guard against some which it assumes will be attempted by requiring in the section just quoted that "all packages containing such dead animals, birds or parts thereof, when shipped by interstate commerce, as provided in section one [three?] of this act, shall be plainly and clearly marked, so that the name and address of the shipper and the nature of the contents may be readily ascertained on inspection of the outside of such packages." A delivery to a common carrier of packages not so marked would be an evasion of the act, and punishable by it, but the mere preparation of them, without more, is not; and that is all that we have here. The count declares that the defendant "did knowingly, willfully, and unlawfully prepare for shipment by interstate commerce, and did have in his possession with intent to ship by interstate commerce, certain packages [describing them], which said packages so prepared for shipment and intended to be shipped by interstate commerce from the state of Pennsylvania to the state of New York, were not then and there plainly and clearly marked," etc. The whole subject of complaint is thus seen to be the preparation and the intent. Had the preparation gone on, and the intent which it manifested been carried out, we should have undoubtedly had an evasion, or an attempted evasion, of the act, if not a direct violation of it. But the most that can be made out of what is so stated is an intent to evade, or the beginnings of an attempt, as we might say, of which the preparation would be evidence, but would not in itself amount to an actual evasion, which is alone prohibited. It required some further step to be taken, by which, if carried out, the party would evade or escape the restrictive provisions of the act. The packages, as it is expressly declared, were still in the possession of the defendant, and therefore under his control, and out of due regard for the law, and a final consideration of his duty in the premises, he might never have let them go; and yet, according to the contention of the government, although the final step had not been taken, he might be arrested and punished as though it had. This would cut off the locus pœnitentiæ which is always supposed to be open until the forbidden act has been actually committed, and this no con-

sideration of the statute, or the purpose to be effected by it, requires us to do. Could we even go so far as to hold that an attempt to violate the act might be considered an evasion of it, we should still be met by the fact that here at most there was nothing but a preparation and an intent, and, according to all the authorities, to constitute an attempt there must be something more. 1 Whart. Cr. Law, § 181. It is to be observed that the first and second counts are open to the same criticism in this respect as the third, each of them merely charging the preparation or concealment of the game in packages for the purpose of shipping it, without more. It may be assigned as an additional and substantial reason for holding as before determined that they set out no case.

According to the views so expressed, I am therefore clearly of the opinion that no evasion or violation of the act is disclosed in the indictment, and that the demurrer must be sustained. The larger question whether the act is a legitimate exercise of the power given to congress by the constitution to legislate with regard to interstate commerce, or is merely, as charged, a national game law, thinly disguised, which it had no authority to pass, although fully discussed at the argument, I do not feel called upon to decide. Neither do I the further question whether—assuming the act to be valid—dead game carried in the hands, or as part of the personal luggage of the party who has killed it, must be regarded as falling within the terms of the act when transported under such conditions from state to state. These are interesting and important, but I prefer to dispose of the case upon others, which are much more obvious.

The demurrer is sustained, the indictment is set aside, and the defendant is discharged from his recognizance.